case number 22-1598 3DT Holdings v. Bard Access Systems, Mr. Gibson whenever you're ready. Thank you your honors, may it please the court. My name is Dan Gibson and I represent 3DT Holdings LLC, the appellant in this matter. The district court erred in granting judgment in favor of Bard Access Systems following the bench trial in this matter for two reasons. First, Bard did not make the requisite commercial practicability determination necessary to relieve it of its obligation to continue to provide development support to the Precisive Navigation Technology. Second, Bard did not provide commercially reasonable support for the first three years following acquisition of the Precisive Navigation Technology. As you're aware, this case involves a claim for breach of technology created by 3DT and to be developed into a medical device by Bard. The Asset Purchase Agreement and the Development Agreement read together required Bard to provide commercially reasonable support to the development of the Precisive Navigation Technology, which they gave the code name Penske. And that development obligation was ongoing unless Bard bought itself out of the agreement or it determined after three years that development of Penske is no longer commercially practicable due to the existence of any or of four specific enumerated circumstances. Am I right that there's a difference in your interpretation of the contract provisions? It's just a question of whether there was, the factual question, whether there were commercial, whether it was I think there is a difference in the way in which we are interpreting it. It seems to me that Bard is making the argument that simply identifying a superior technology automatically means it is no longer commercially practicable. We believe... Can I ask, is your argument that if Bard determines that it's no longer commercially practicable due to the existence of superior technology, do you think there still needs to be a further finding? A second, you know, an independent determination that Penske was no longer commercially practicable? I think the commercial practicability is the overall decision that had to be made to relieve them of the obligation. And then it had to be for one of those reasons. It could be commercially impracticable to continue to develop Penske for reasons other than those four. On the other side... But if Bard determines that it's not, it's no longer commercially practicable due to the existence of superior technology, is that the end of the story? Or is there a further finding that your interpretation of the contract requires Bard to make? No, I don't believe there's a further finding. I think that they just simply must determine it's no longer commercially practicable due to one of those reasons. But Bard has admitted that it did not make that commercial practicability determination. It simply identified MODIS II as a technology that it believed to be... But the district court found, I'm quoting, 3DT has not proved that Bard was not exercising its reasonable business judgment or acting in good faith when it concluded that MODIS II was a superior technology that rendered Penske no longer commercially practicable at that time. So as I understand that finding, that is fully consistent with what you just said, your interpretation of the contract requires. Yes, so the only way that that, given the admission of Bard and the evidence at trial, the only way that statement from the district court works is if you're following the interpretation of Bard, that you simply identify a superior technology, it automatically means there is no commercial, it's no longer commercially practicable. So I want to understand this because the briefs kind of tuck across from each other because I understand that sentence that I read as a quote from the district court opinion to be exactly what you agreed with me a moment before had to be had to be Bard's determination. What's the difference that you're drawing? On its face it is what I said and what the contract says, but given the evidence in the admission at trial, so there was no decision made. So to Judge Park's question, that is just a factual dispute, not a contract interpretation. I don't, I don't know that's a factual dispute when Bard has admitted that the decision was not made and if you look at the rest of the evidence on this issue, you have Ed Burnside who was the vice president of research and development stating that if this decision were made with respect to commercial practicability, it would be in management board meeting minutes. It was not. You have Anthony Meisner whose deposition testimony was admitted at trial that and he was also testifying as the 30B6 witness for Bard stating he was not aware of such a decision. They simply testified that they believe in certain aspects Modus II was superior and and I don't dispute that they believed that nor that those reasons are justified, but simply being superior in certain aspects does not mean that you still can't develop Penske in a manner that is commercially practicable and I think... Here's where you're losing me. I understand there are contentions to be made on your side and your opponent has contentions to be made on its side, but you know Judge Lyman had a trial, he listened to the witnesses, he made findings of fact. Your argument at this point necessarily has to be that Judge Lyman's findings on issues like the ones we were just discussing were clearly erroneous. I believe that yes, there were findings of fact made, but the findings of fact that were made do not support the conclusion that the requisite determination was made. If you look at what he based his decision on, we were talking about Anthony Meisner's testimony, that it was superior in some regards, but then he also testified that 3DT's technology was superior in some regards. This is not de novo review, this is for clear error, and so the fact that there are differences, that there are arguable differences for both sides, that ship is safe. I don't think we're disputing any of the testimony. I think what we're saying is they have admitted that they did not make the separate requisite determination that was no longer commercially practicable. Simply having a superior technology does not mean that the other technology is no longer commercially practicable, and in our reply brief we used the iPhone example, and I think that's the perfect example. But weren't they entitled to go with a superior technology if one presented itself? The contract seems to me doesn't make a lot of sense if there could both be a superior technology and an obligation to use yours. I mean, that doesn't seem to be what the parties had agreed to. I think it does, Your Honor, especially in light of the testimony from Anthony Meisner, that they are both competing in complementary technologies, that there's room for both in the marketplace. And so by saying that- But they didn't agree with that, so their obligation was reasonable judgment. With respect to the decision, though, they had admitted they did not make the commercial practicability decision, only that they believed a superior technology existed. And I don't disagree that that may have been a reasonable decision, but the factors that they cited for that- Why didn't the contract bar them from going with that once they reasonably made that decision? Because they didn't make the full decision. They only made the decision that there was a superior technology. They didn't determine that because of that technology, let's just put precisive navigation away because there is no value to it. It has no value in the marketplace. But I mean, doesn't that inexorably fall? I'm sorry, what was that? Doesn't that fall if we identify reasonable technology in this context, I'm entitled to go for it? No, only if it renders it no longer commercially practicable, and that's why it was important to note the testimony that there's room for both in the marketplace. And I go back to my iPhone example on that. You can still make a profit off this technology, even though there's maybe something else better out there. And that's the determination that was not made and they admitted was not made. I see my time is up. Thank you, Councilor. You're reserved a few minutes for rebuttal. Mr. Mantel. May I begin? I was waiting here. Thank you. Good morning. May it please the Court, Natalie Mantel from McCarter & English on behalf of Apelli Bard Access Systems. Your Honor, 3DT is asking this Court to rewrite the contract. But the language is clear, and it is very deferential to Bard, one of the largest medical device companies in the world. Bard bargained for the language that gives it the right to make determinations in good faith based upon its reasonable business judgment, and that's exactly what it did. It seems like the other side's argument hinges on this notion that there was a concession, that all you had to show was there's a superior technology. Is that your position, and did you so concede? Absolutely not, Your Honor. I did not concede that at trial. Bard did not ever admit that it did not make a determination. What I said at trial has been Bard's position the entire time, even starting at summary judgment, which is that the two parts of the commercial practicability provision of this contract are linked. We believe that they are. It's a single conclusion with a causal element embedded in it. Exactly. That's what I understand the position, and frankly, that's how I read the contract. Yes, exactly right, Your Honor, and that is because of the phrase due to, which means because of. It's in Black's Law Dictionary. And as a result of that preposition, the sentence is a single sentence and needs to be read as a single sentence. And I think it doesn't matter really whether 3DT or Bard's interpretation is correct because there's ample evidence in the record for a determination that was made. So regardless of whether there's one determination that needs to be made or two, there is evidence in Rob Frederick's two letters that he sent to 3DT, which Judge Lyman relied upon in his decision. There is evidence in Ed Burnside's testimony, which says that a determination was made, and he believes that it was in 2017. He also testified that he believed at the end of 2015 and beginning of 2016 that he absolutely believed that Modus II was superior to Penske. There's testimony from Anthony Meisner where he says that a determination was made, but he doesn't know when. What about your adversary's argument that these were potentially complementary technologies, and so I guess the district court clearly erred by not considering that possibility of stopping at the superiority? At the outset, Your Honor, when these technologies were acquired, and they were acquired within the same week of each other, they were complementary technologies. But the fact of the matter is that over that three-year period when Bard was trying to develop the Penske technology, it hit roadblock after roadblock after roadblock. And as a result of those roadblocks, at the end of the three-year period and even after the three-year period, it became very clear that they were not complementary technologies because Bard could not get Penske to market,  and Modus II did not have the same challenges that Penske had. And so as a result of that, 3DT's iPhone example is not a fair comparison because in that example, Apple could get both versions of the iPhone to market. But here, Bard could not get Penske to market despite its best efforts, despite over 15 animal studies, glass heart experiments, trying to get a proper regulatory strategy that would work despite the FDA's changing the guidance and changing the requirements for the 510K process in the middle of the three-year period. So there were lots of hurdles that Bard would need to overcome in order to commercialize this device. And that just is not the case with Apple. With respect to the superiority determination, I would note that is Bard's determination to make. Counsel referred to the language as determined by Bard in good faith based upon its reasonable business judgment as only referring to commercial practicability, but that's not the way the contract is written. The contract says if Bard determines in good faith based upon its reasonable business judgment, that development is no longer commercially practicable due to the existence of superior technology. So that language, the deferential language to Bard, applies to both commercial practicability and superiority because as I said at trial, and this is not an admission that there is no commercial practicability determination, the two are linked. It is Bard made the determination over a period of years based upon all of the challenges that it faced that Penske was not going to make a profit at that time. And the other thing that I'd just like to note for the court with respect to that provision is that 3DT's interpretation that the language no longer commercially practicable means commercially impracticable, which I think is, number one, not what it says, but it does not invoke the doctrine of commercial impracticability under New York law. Because if 3DT's interpretation of that language means impossible, then the last sentence of that provision, which 3DT omitted from its brief, is rendered meaningless. That provision contemplates a situation where Bard could stop providing commercially reasonable support and determine that development was no longer commercially practicable at that time and then later resume development and obtain 510K clearance and then have to pay the milestone payment. So the contract specifically contemplates the situation that we have here. And 3DT's interpretation of that language to mean that Bard had to determine that development was impossible doesn't make sense based upon the language. Second, with respect to commercial reasonableness and 3DT's arguments that Bard did not devote commercially reasonable support, I think where we need to start with that is the case law. Because the case law defines commercial reasonableness as a fairly lenient standard and a requirement that Bard make some conscious exertion to accomplish the agreed upon goal. And that is what Bard did. It is a floor. And the deferential language to Bard appears in that provision as well. So the language as determined by Bard in good faith based upon its reasonable business judgment applies to the commercially reasonable personnel financial and other support that Bard provided to the project. And it allows Bard, as Judge Lyman found, to do business as usual. To treat Penske the way it treated every other new product development project. And there's evidence in the record that Judge Lyman relied upon that that is exactly what Bard did. In fact, it devoted even more resources to the Penske project at the beginning because it was so excited about this. Can I ask on your interpretation of this provision, if Bard concluded that it would lose money on Penske or it could make more money with another project, could Bard conclude that the commercially reasonable level of support for Penske was no support? I don't believe it could determine that it was no support, Your Honor. But that's obviously not what happened here. There were lots of efforts, even in 2016, to develop this project and move it forward. And what happened in 2016 was that there was, they had done study after study after study and they even did those studies into 2016 and they were running up against roadblocks. And so they reached out to 3DT and said, we need help. We don't know what else to do. Keeping in mind, this is Bard, right? This is one of the largest, most successful medical device companies in the world. The person who is leading this team is the person who helped develop the market-leading tip location system in the world. They have 80% market share. And so they didn't know what else to do. And so they reached out to 3DT and they said, we need help. And they continued to do other things that they could do in the meantime until they could get 3DT's help and move the project forward. And as soon as that NDA was signed, Anthony Meisner came up with an outline to ask questions to 3DT and went out to California to meet with the owner of 3DT. And that was in September 2016. And those efforts continued until the end of 2016 when the writing was on the wall and the company determined that it just wasn't going to work. And so they made the determination to stop because of Modus II at that point. I see my time is up, if I just may conclude. There is no question that Bard fulfilled its contractual obligations. The trial court's findings of fact and conclusions of law are supported by evidence in the record and can survive any appellate review. Thank you. Thank you, counsel. We'll hear a rebuttal. Thank you, Your Honors. I do want to go back briefly to this commercial practicability issue because I think it's important. Ms. Mantel said that the iPhone example doesn't work or isn't analogous because Apple has the ability to get both to market and this didn't work. The testimony of Anthony Meisner that there were complementary technologies and there was room for the marketplace in both was last year in a courtroom just across the street at trial. That was current. That wasn't back when they bought these technologies in 2013. As of a year ago at trial, he said there was room in the marketplace for both. And with respect to the testimony or the argument that it didn't work, they tried that at trial and then Anthony Meisner recanted on cross-examination and didn't recall even putting that in his declaration and saying the technology always worked. And if you look just really hard at the reasons why they claim Modus II to be superior, those may be reasons why they are superior. Counsel, we're not a trial court. We're reviewing for clear error. You may have good arguments that you put forth before Judge Lyman, but that ship sailed. Your Honor, I do believe that the contract, Judge Lyman's decision only makes sense if he is interpreting the contract in the way that they have interpreted it, that simply showing a superior technology means it's commercially impracticable and it does not. And I don't think that showing was made and, therefore, I think it's a de novo review. I do want to touch briefly on the commercial reasonableness. One thing that we noted in our brief that I didn't hear any response to was that they stopped funding. There was testimony from Ed Bernstein that they completely stopped funding in quarter one of 2016. That was not rebutted in any fashion. The contract required commercially reasonable financial support. In addition, I don't believe that the contract allowed for business as usual. I don't know what their other contracts look like, but this one was very specific and required commercially reasonable support. Thank you. I see my time's up. Thank you, Counsel. Thank you both.